AUTOMOBILE INSURERS BUREAU OF MASSACHUSETTS &
others *vs.* COMMISSIONER OF INSURANCE.

Suffolk. May 3, 1993. - June 8, 1993.

Present: LIACOS. C.J.. NOLAN. LYNCH. & O'CONNOR. JJ

*Insurance*, Motor vehicle insurance, Rating, Commissioner of Insurance.

In a proceeding by the Commissioner of Insurance under G. L. c. 175,
§ 113B, to establish private passenger motor vehicle insurance rates for
1993, the commissioner acted within the broad discretion allowed her
under the statute in evaluating the adequacy of the insurers' programs
for cost control; she was not required to adopt specific cost control pro-
grams or to modify performance standards. [458-460]

In a proceeding by the Commissioner of Insurance under G. L. c. 175,
§ 113B, to establish private passenger motor vehicle insurance rates for
1993, the commissioner's rate adjustment, based upon her determina-
tion that excessive claim payments were due to inadequate cost control
efforts by insurers, had substantial support in the evidence [461-462];
however, where the commissioner's calculation reflected an erroneous
interpretation of the record, the matter was to be remanded to the com-
missioner for recalculation of the rates [462-463].

In a proceeding by the Commissioner of Insurance to establish private pas-
senger motor vehicle insurance rates for 1993, the Commissioner of In-
surance, after finding, on sufficient evidence, that a persistently wide
and unexplained variation existed among the expenses of insurance
companies operating in Massachusetts, properly applied a competition
adjustment factor based on the methodology employed in prior rate
proceedings. [463-464]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on January 8, 1993.

The case was reported by *O'Connor*, J.

*E. Michael Sloman* (*Michael B. Meyer* with him) for the
plaintiffs.

*Thomas O. Bean*, Assistant Attorney General, for the
Commissioner of Insurance.

*James K. Brown, Michael I. Joachim & Barnett D. Ovrut,* for Hanover Insurance Company, amicus curiae, submitted a brief.

NOLAN, J. On December 22, 1992, the Commissioner of Insurance (commissioner) entered a decision fixing the private passenger motor vehicle insurance rates for 1993 in accordance with G. L. c. 175, § 113B (1990 ed.). The Automobile Insurers Bureau of Massachusetts[1] (AIB) and ten of its member companies filed a complaint in this court on January 8, 1993, seeking judicial review of the commissioner's decision. On joint motion of the parties, a single justice of this court reserved and reported the case for determination by the full bench. Because we conclude that the commissioner based her rate adjustments, at least in part, on an erroneous calculation, we remand the case for further findings.

The facts are as follows. On July 2, 1992, after a public hearing, the commissioner determined that competition was insufficient to assure that private passenger automobile insurance rates would not be excessive. Therefore, in accordance with G. L. c. 175E, § 5 (1990 ed.), she invoked the procedures of G. L. c. 175, § 113B (1990 ed.), to fix and establish such rates for calendar year 1993. Interested parties were invited to participate in the proceedings. Four parties formally intervened: the AIB; the State Rating Bureau of the Division of Insurance (SRB) pursuant to G. L. c. 26, § 8E (1990 ed.); the Attorney General pursuant to G. L. c. 12, § 11F (1990 ed.); and an association of insurance agents concerned with the agents' commission allowance required by G. L. c. 175, §§ 113B and 162D.

The parties stipulated to all but three issues. The commissioner accepted the stipulations, and hearings were held on the following: (1) the loss trend factors for physical damage

---

[1]The Automobile Insurers Bureau of Massachusetts is an unincorporated voluntary association of insurance companies licensed to write automobile insurance in Massachusetts. It was formerly known as the Massachusetts Automobile Rating and Accident Prevention Bureau. See *Aetna Casualty & Surety Co.* v. *Commissioner of Ins.*, 408 Mass. 363, 364 n.2 (1990).

coverages; (2) the cost containment adjustment for fraudulent bodily injury claims; and (3) the competition adjustment factor for the company expense allowance. The AIB appeals only from the commissioner's decisions regarding the last two issues. Based on the record of the cost containment hearing, the commissioner found that the insurers had mishandled fraudulent bodily injury claims. Consequently, the commissioner reduced the increase for bodily injury rates by 4%, and the increase for personal injury protection by 2%. These adjustments produced an over-all reduction of approximately 1.1% in the 1993 rates.[2] With regard to company expenses, the commissioner found a persistently wide and as yet unexplained variation among companies operating in Massachusetts. As a result, she imposed a 0.85% competition adjustment factor, reducing the 1993 rates by approximately 1.5%.

In reviewing the commissioner's decisions under G. L. c. 175, § 113B, one inquiry is "whether the rates have reasonable support in evidence." *Aetna Casualty & Surety Co.* v. *Commissioner of Ins.*, 408 Mass. 363, 378 (1990), quoting *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 384 Mass. 333, 337 (1981). We have noted previously that this standard is indistinguishable from the substantial evidence standard. *Id.* at 378 n.14, citing *Medical Malpractice Joint Underwriting Ass'n* v. *Commissioner of Ins.*, 395 Mass. 43, 54 (1985). See also G. L. c. 175, § 113B (commissioner shall justify deviation from recent data by "substantial evidence"); G. L. c. 30A, § 1 (6), second par. (1990 ed.) ("substantial evidence" means such evidence as a reasonable mind might accept as adequate to support a conclusion). In making her decisions, the commissioner is not required to make findings on every issue so long as her findings "indicate the over-all basis for [her] decision." *Aetna Casualty, supra* at 374, 378. If there is substantial evidence supporting the commissioner's decision, we will

---

[2]Even with these reductions, the commissioner's decision still increases the general 1993 rates for private passenger automobiles by 5.2%.

not substitute our own judgment for hers. *Massachusetts Auto. Rating & Accident Prevention Bureau, supra* at 337.

1. *Fraud adjustment.* The AIB challenges the commissioner's fraudulent claims adjustment on three grounds: (1) the commissioner ignored the statutory scheme for mandating necessary cost containment programs; (2) the adjustment was not based on substantial evidence; and (3) her calculation of the rate adjustment reflects an erroneous interpretation of the record evidence. We shall address the claims seriatim.

a. *Statutory scheme.* The AIB asserts that the statutory scheme for cost control requires the commissioner to compel specific programs and to direct performance standards to achieve certain cost control objectives. From this assertion, AIB concludes that the commissioner's failure to rely exclusively on these statutory mechanisms invalidates her rate adjustment. We disagree.

The commissioner is bound to fix and establish insurance premium charges which are "adequate, just, reasonable and nondiscriminatory." G. L. c. 175, § 113B (1990 ed.). Apart from this duty, the commissioner is also required to "determine whether insurance companies utilize adequate programs to control costs and expenses, in accordance with standards determined or approved by the commissioner."[3] *Id.* The commissioner's determination is based upon information that AIB is required to file.[4] *Id.* If the commissioner finds

---

[3]The provision of § 113B dealing with cost control programs reads: "The commissioner upon the basis of information which shall be filed by the [AIB], shall determine whether insurance companies utilize adequate programs to control costs and expenses, in accordance with standards determined or approved by the commissioner. At a minimum, such programs shall be designed to have a material impact on premium charges by reducing costs and expenses incurred by insurance companies. In the event the [AIB] fails to make such filing, or if the commissioner determines that the filing is deficient or that the programs are inadequate, the commissioner shall limit in any manner he determines to be appropriate the amount of any adjustment in premium charges based upon changes in costs and expenses."

[4]The commissioner has promulgated regulations specifying what information the AIB must provide in its annual rate filing. 211 Code Mass.

either the filing or the programs "inadequate," she must make adjustments in the premium charges "in any manner [she] determines to be appropriate." *Id.* Thus, by its plain language, the statute does not require the commissioner to dictate specific fraud control programs; rather, the commissioner must evaluate the adequacy of the insurers' programs and adjust the rates accordingly.[5]

In further support of their interpretation, the AIB points to a provision in § 113B which states that "[t]he commissioner shall direct the plan created under [§ 113H] to establish procedures for the implementation, monitoring and enforcement of programs to control costs and expenses identified by the commissioner in accordance with this paragraph." The plan created under G. L. c. 175, § 113H (1990 ed.), provides motor vehicle liability insurance to applicants who are otherwise unable to obtain it. *Hartford Accident & Indem. Co.* v. *Commissioner of Ins.*, 407 Mass. 23, 24 (1990). As we explained previously, "[a]ll motor vehicle insurers in Massachusetts are required to participate in the plan as members of the Commonwealth Automobile Reinsurers (CAR)." *Id.* The AIB argues that this provision, when read together with G. L. c. 175, § 113H (C) and (E) (which require CAR to adopt performance standards for combatting fraud), compels the commissioner to use these standards as the most "effective" means of implementing cost control.[6]

---

Regs. § 93.00 (1987). The information must include, inter alia, a detailed description of insurers' cost containment programs. 211 Code Mass. Regs. § 93.04 (3). In general, these regulations provide the AIB with notice of the standards by which the commissioner will evaluate their cost control measures in accordance with G. L. 175, § 113B. *Id.*

[5]Even if we agreed with the AIB that the statute requires the commissioner to mandate specific cost control programs, the plain language of the statute still requires the commissioner to evaluate the effectiveness of those programs. Therefore, any failure by the commissioner to enumerate specific programs would not affect her authority to determine if existing cost control measures were "adequate" and to adjust the rates appropriately.

[6]General Laws c. 175, § 113H (C) (1990 ed.), reads in part: "The governing committee [of the plan] shall . . . prepare performance standards for the handling and payment of claims by the service carriers. Such standards shall be designed to ensure the speedy settlement of valid claims at

In response, we note first that even if control of these performance standards is the most effective means available to the commissioner, it does not follow that this should be the "exclusive" means. Indeed, as we noted above, the statutory scheme leaves the commissioner with broad discretion both in setting the ends and in fashioning the means of cost control. Second, while the commissioner must "indicate" the programs for which CAR is required to establish procedures, it is CAR, not the commissioner, which carries the duty to establish fraud control programs under § 113B. Similarly, § 113H obligates CAR, not the commissioner, to adopt performance standards. The commissioner's role is only to approve or modify those standards. We also note that the commissioner's duties with respect to CAR are distinct from those which she owes to non-CAR policies as well as from the general directive to evaluate cost control programs and adjust rates.[7] If the commissioner failed to fulfil her statutory obligations with respect to CAR, this would not affect the validity of her decisions pertaining to non-CAR policies. Thus, the promulgation of performance standards by CAR in no way restricts the commissioner's authority to evaluate cost control programs under § 113B. We conclude, therefore, that any failure by the commissioner to adopt specific cost control programs or modify performance standards does not invalidate the rate adjustment.

---

the lowest reasonable cost and the denial of fraudulent or otherwise invalid claims. Such performance standards shall be submitted to the commissioner of insurance who, after a public hearing, shall approve or modify such performance standards."

Section 113H (E) reads in part: "The plan shall adopt performance standards for claims handling and anti-fraud efforts, including but not limited to programs to control costs and expenses as described in [§ 113B], for risks insured or reinsured by the plan. . . . The plan shall propose and the commissioner shall establish rules concerning the submission of data by insurers."

[7]The commissioner does not require each insurer to maintain identical cost control programs, 211 Code Mass. Regs. § 93.05 (3), and there is nothing in § 113B which mandates them to do so.

b. *Substantial support.* After reviewing the record, we also hold that the rate adjustment finds substantial support in the evidence.[8] As we stated in an earlier case, "[i]n order to engage in normative rate making, the commissioner must make findings, supported by substantial evidence, that the payments in question are excessive and that the excess is due to the failure of the insurers to exercise adequate controls." *Massachusetts Auto. Rating & Accident Prevention Bureau v. Commissioner of Ins.,* 401 Mass. 282, 299 (1987), citing *Medical Malpractice Joint Underwriting Ass'n, supra* at 54. Evidence was presented that Massachusetts leads the nation in the rate of bodily injury claims filed and that this rate is increasing. Furthermore, the AIB's filing indicates that 10% of bodily injury claims filed in Massachusetts in 1989 were fraudulent and 46% were built-up or inflated. By comparison, a 1985-1986 study showed that built-up claims amounted to only 33%. Thus, the 1989 study indicates that the amount of built-up claims in Massachusetts is increasing. Of the 1989 built-up claims which were settled, the study reveals that insurers were able to reduce payments by 22% from the amounts claimed. However, the AIB concluded that only 2% of all claims were deniable on the basis of fraud. The AIB, although contesting the commissioner's conclusions, offered no evidence that these statistics do not accurately reflect the present state of fraud control in the insurance industry. We conclude, therefore, that this evidence provides substantial support for the commissioner's finding that Massachusetts insurers are paying excessive bodily injury claims.

The commissioner also bases her rate adjustment on a finding that excessive payments are due to inadequate cost control efforts by the insurers. Her finding rests on expert testimony indicating that insurers have failed (1) to utilize

---

[8]The commissioner also found that the AIB's filing was "deficient" as a matter of law but chose not to base her rate adjustment on that finding alone. Under § 113B, the commissioner is authorized to modify rate adjustments upon a finding either that the filing was deficient or that the cost control programs were inadequate.

effectively the special investigation units, (2) to use scientific and statistical techniques to investigate fraud, (3) to educate employees adequately in fraud detection practices, and (4) to utilize fully the insurance fraud bureau. This evidence is adequate to support a finding that increased efforts by insurers could decrease excessive payments.

c. *Rate calculations.* Lastly, the AIB contends that the commissioner's calculation of the rate adjustment reflects an erroneous interpretation of the record. We agree. Relying on the AIB study, the commissioner found that 20% of 1989 bodily injury losses were excessive. She arrived at that conclusion by adding the percentage of fraudulent claims (approximately 10%) to the payments made on built-up claims (46% built-up x 22% average reduction if settled = 10.12 %).[9] As the AIB correctly points out, this calculation is erroneous. The 1989 study does not show that insurers incurred unnecessary losses (made excessive payments) of 22% on 46% of all claims but rather that insurers reduced payments by an average of 22% on built-up claims which were settled. Thus, the 22% figure represents payments which were not made (losses not incurred).[10] Moreover, the 10% figure for fraudulent claims includes claims which were both fraudu-- lent and built-up and which amount to 7.6% of all claims (1.5% fraudulent + 7.6% fraudulent and built-up = 9.1%). Thus, the 46% figure for built-up claims includes most of the fraudulent claims as well (39.2% built-up + 7.6% built-up and fraudulent = 46.8%). By using 46% (instead of 39.2%) to represent the percentage of losses attributable to built-up claims alone, the commissioner double-counts the 7.6% of claims which are both fraudulent and built-up. Because of these errors, the commissioner's finding that 20% of bodily injury losses were excessive fails to find

---

[9] Since the AIB provided no evidence to the contrary, the commissioner assumed that the 1991 losses, which form the basis for the 1993 rates, would be similar.

[10] The AIB 1989 study does not state what percentage of built-up claims eventually were settled.

substantial support in the record.[11] Since the commissioner relied on this finding, at least in part, in setting the rates for 1993,[12] we must remand the case for recalculation of the rates. See *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 401 Mass. 282, 292-293 (1987).

2. *Expenses adjustment.* The 1993 competition adjustment factor is based on virtually the same evidence which we found sufficient first in *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 381 Mass. 592, 602-603 (1980), and again in *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 384 Mass. 333, 337-338 (1981), i.e., a wide and unexplained variation in expenses among companies writing automobile insurance policies in Massachusetts. The commissioner's methodology has also remained essentially the same. We reasoned that "[w]here a particular item of cost varies widely from company to company and the Commissioner is fixing industry-wide rates, [she] must be allowed considerable discretion to exclude the highest costs from consideration, even

---

[11]We are aware that the commissioner cannot calculate precisely the percentage of 1989 losses that were excessive, beyond the 10% or so that were fraudulent, because there is no information regarding actual losses attributable to built-up claims alone. We further recognize that under G. L. c. 175, § 113B, the burden to produce such evidence rests with the AIB. The law, however, does not require exactness in setting rates. See *Attorney Gen.* v. *Commissioner of Ins.*, 403 Mass. 370, 377 (1988) (mathematical precision not required in setting rates); *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 401 Mass. 282, 301 (1987) (exact quantification unnecessary if rate reduction within range of possible reductions supported by the evidence).

[12]As noted above, the AIB asserts that only 2% of claims are deniable on the basis of fraud. On the other hand, the State Rating Bureau and the Attorney General presented evidence that a conservative rate reduction would amount to 8.39% for bodily injury claims and 2.94% for personal injury protection claims. Starting from her conclusion that as much as 20% of bodily injury losses were excessive, the commissioner determined that rate reductions of 4% and 2%, respectively, would be appropriate. The commissioner justified the difference between the two rates by concluding that fraud was more likely to occur in bodily injury claims that cover damages for pain and suffering.

though [she] cannot prove how they could be reduced." *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 384 Mass. 333, 338 (1981), quoting *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 381 Mass. 592, 603 (1980). Contrary to the AIB's claim, our decision in *Massachusetts Auto. Rating & Accident Prevention Bureau* v. *Commissioner of Ins.*, 401 Mass. 282 (1987), does nothing to disturb this reasoning, and we rely on these precedents once again. See *Aetna Casualty & Surety Co.* v. *Commissioner of Ins.*, 408 Mass. 363, 373 (1990) (not improper for commissioner to rely on prior decisions as precedent).

3. *Disposition.* We remand the case to the county court which shall issue an order for the commissioner to recalculate the rate adjustments for 1993 in a manner consistent with this opinion and to hold further hearings, if necessary, on the percentage of bodily injury losses that were excessive.

*So ordered.*