MASSACHUSETTS ASSOCIATION OF INSURANCE AGENTS *vs.*
COMMISSIONER OF INSURANCE.

Suffolk. May 7, 1997. - July 17, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, O'CONNOR, GREANEY, FRIED, & MARSHALL, JJ.

*Insurance,* Motor vehicle insurance, Commissioner of Insurance, Agent, Rate
setting. *Administrative Law,* Rate regulation. *Statute,* Construction.

The Commissioner of Insurance properly used a net basis methodology to set
agents' automobile insurance commission rates in 1997 pursuant to the
plain language of G. L. c. 175, § 162D, applying the Statewide average
commission percentage to premiums that have been reduced by downward
deviations (such as safe driver credits) pursuant to G. L. c. 175, § 113B
[480-483]; the commissioner's rate setting decision was supported by her
findings [483-484]; and the fact that a different methodology was used in
1996 did not require its continued use in 1997 [484-485].

CIVIL ACTION commenced in the Supreme Judicial Court for
the county of Suffolk on January 31, 1997.

The case was reported by *Abrams,* J.

*James K. Brown* for the Massachusetts Association of Insur-
ance Agents.

*Thomas O. Bean,* Assistant Attorney General, for the Com-
missioner of Insurance.

GREANEY, J. On January 24, 1997, the Commissioner of Insur-
ance (commissioner) released her "Opinion, Findings and Deci-
sion on 1997 Automobile Insurance Rates" (1997 decision). As
a part of her decision, the commissioner determined that agents'
commissions for motor vehicle policies in which the premium
charges were based on a downward deviation from standard
rates (including those written under the safe driver insurance
plan) should be calculated by applying the Statewide average
commission rate against the actual premium paid ("net" basis),
rather than against the premium before it was reduced by any
downward deviation ("gross" basis). The Massachusetts As-
sociation of Insurance Agents (MAIA) sought judicial review of
the commissioner's decision in the Supreme Judicial Court for

Suffolk County pursuant to G. L. c. 175, § 113B. On joint motion of the parties, a single justice reserved and reported the case without decision for determination by the full court. We direct the entry of a judgment affirming the portion of the commissioner's decision put in issue by the MAIA.

1. *Background.* Under G. L. c. 175E, § 5, if the commissioner determines that competition among insurers is insufficient to assure that private passenger automobile insurance rates will not be excessive, she can invoke G. L. c. 175, § 113B, to "fix and establish" automobile insurance rates for the forthcoming calendar year. This includes a determination of the allowance for commission pure premium expense (CEPP), an amount used to calculate the average Statewide commission rate. This rate is expressed in terms of a percentage applied to premiums charged to customers in order to determine the amount of compensation owed to agents.

In 1995, the commissioner concluded that the market for automobile insurance was not conducive to competition. She then initiated proceedings to "fix and establish" rates under c. 175, § 113B, and subsequently issued her decision on 1996 automobile insurance rates, which included a stipulated amount of CEPP for policies issued or renewed during 1996. After the 1996 rates were determined, several insurers obtained approval from the commissioner to offer lower rates to safe drivers (downward deviations), as provided under § 113B. The MAIA then sought an advisory ruling from the first deputy commissioner of the division of insurance (division) as to whether insurers would be required to pay agent commissions on a "gross basis" (before downward deviations were taken) or on a "net basis" (based on the actual premium collected). Because there was no evidence to suggest that the CEPP figure for 1996 had been adjusted to reflect any possible downward deviations, the commissioner's first deputy determined that, for 1996, agent commissions should be based on "gross" premiums, i.e., premiums calculated before application of a downward deviation.[1] The first deputy expressly limited his determination to rate year 1996.

---

[1]The average commission rate in 1996 was 13.8%. In determining that the agents' commissions should be calculated on a gross basis, the first deputy assumed that the CEPP used to calculate this percentage rate did not take into account either the possibility of downward deviations under G. L. c. 175, § 113B, or their potential impact on the actual amount of Statewide collectible premiums.

In 1996, the commissioner initiated proceedings to "fix and establish" 1997 automobile insurance rates for the forthcoming year. Interested parties were invited to participate in the administrative proceedings on the various components of the rate setting process. Four parties formally intervened: the Automobile Insurers Bureau (AIB), an unincorporated voluntary association of insurance companies licensed to write automobile insurance in Massachusetts (see *Automobile Insurers Bur. of Mass.* v. *Commissioner of Ins.*, 415 Mass. 455, 456 n.1 [1993]); the State Rating Bureau (SRB); the Attorney General; and the MAIA.

All aspects of the case were resolved by stipulation, with the exception of issues relating to agents' commissions. On January 23, 1997, the SRB, the Attorney General, and the MAIA submitted a stipulation to the commissioner that settled all issues relating to the agents' commissions, except for the question of the proper methodology to be used in calculating agents' commissions on policies where premiums reflected downward deviations. In their stipulation, the parties agreed on a CEPP of $117, from which it was anticipated the commissioner would calculate the Statewide average commission allowance.[2]

The commissioner issued her rate setting decision on January 24, 1997, and in it concluded that the agents' commission rates should be calculated on a net basis. Under her chosen methodology, according to the commissioner, insurers were to calculate the amount of agent commission by applying the Statewide average commission rate to net premiums, that is, after any downward deviations were applied to the gross premiums.

2. *The MAIA's challenge to the commissioner's decision.* The MAIA has challenged the commissioner's determination, contending that (a) the plain language of the statute precludes the commissioner from taking any action, including the net basis methodology specified in her decision, that would result in a reduction in the total dollars paid to the agents; (b) the commissioner's findings are inadequately supported for purposes of

[2]The stipulation stated that " 'commission expense provisions in the rates' shall mean the provision in the Decision on 1997 rates for commission expense pure premium, from which the Commissioner calculates the statewide average commission percentage allowance." The parties further stipulated that the " 'net/net' versus 'net/gross' issue, so-called," regarding the implementation of the CEPP, was not settled and was to be resolved through the commissioner's decision, but the MAIA also reserved its right to appeal that decision with respect to these issues.

judicial review; and (c) the commissioner's decision, in coming to a different conclusion from the one reached by her first deputy in 1996, is a departure from the reasoned consistency required of administrative decisions. Based on these arguments, the MAIA contends that this court should reverse the commissioner's decision and order that agents' commissions be calculated on a gross basis. We reject these arguments.

(a) The MAIA asserts that the commissioner's choice of the net basis methodology is impermissible under the plain language of the statute. The applicable portions of G. L. c. 175, § 162D, read as follows:

> "Any insurer . . . which [does] business in the commonwealth through independent licensed insurance agents [covered by this section], *shall pay each agent the indicated expense premium commission as established by the commissioner in [her] opinion, findings and decision* on automobile insurance rates as commission only, and no portion of the indicated expense premium commission shall be considered as profit sharing or expense reimbursement. The insurer shall be allowed a variation in the commission paid to each agent of not more than plus or minus ten per cent of the dollar commission established in the commissioner's findings; *provided, however, the insurer shall be required to pay to its agents all of the commission dollars allowed in the rates as commissions.*" (Emphases added.)

The MAIA contends that the emphasized language prevents the commissioner from allowing insurers to calculate agents' commissions by applying the Statewide average commission percentage to premiums that have been reduced by downward deviations. The MAIA reasons that, if the 1997 Statewide commission percentage is applied to a reduced premium, it will result in the payment of an amount less than the "indicated expense premium commission . . . established by the commissioner in [her] opinion, findings and decision," and that this is an impermissible result under the plain language of the statute. Our construction of this statute does not support the MAIA's conclusion.

In its emergency preamble, G. L. c. 175, § 113B, declared that its purpose was to "immediately require certain insurers to

pay the premium commission earned by certain insurance agents." The thrust of this part of the statute is to ensure that agents are paid the commissions due and allocated to them under the commissioner's decision. The statute provides that an insurer pay "the indicated expense premium commission as established by the commissioner in [her] opinion, findings and decision . . . as commission *only*" and after mandating that insurers pay agents the indicated CEPP, the statute goes on to specify that "no portion of the [CEPP] shall be considered as profit sharing or expense reimbursement" (emphasis added). See *Nationwide Mut. Ins. Co.* v. *Commissioner of Ins.*, 397 Mass. 416, 423 (1986) ("[Section 162D] requires companies to pay their agents according to rates established by the commissioner in his annual decision"). Even the precise language relied on by the MAIA can be read to support this purpose: the insurer is allowed to vary the amount of commission paid to each agent by 10%, provided that "all of the commission dollars allowed in the rates" are paid "*as commissions*" (emphasis added). The statute was not enacted to guarantee insurance agents a fixed sum of money for each policy sold.

This conclusion is supported by the over-all statutory scheme governing the regulation of rates for motor vehicle insurance, G. L. c. 175, c. 175A, and c. 175E.[3] The various provisions governing the regulation of motor vehicle insurance rates are interspersed and interwoven throughout these chapters. "Statutes concerning a common topic are to be read 'as a whole to produce an internal consistency.' " *Charles C.* v. *Commonwealth*, 415 Mass. 58, 64 (1993), quoting *Commonwealth* v. *Fall River Motor Sales, Inc.*, 409 Mass. 302, 316 (1991). As a consequence, it is proper to look to other provisions of these statutes that govern the same area of rate regulation for guidance in interpreting § 162D. See *Hartford Ins. Co.* v. *Hertz Corp.*, 410 Mass. 279, 284 (1991).

---

[3]General Laws c. 175 governs, generally, "insurance," including "compulsory motor vehicle liability insurance" (§§ 113A-113R) and "agents, brokers, and adjusters" (§§ 162-177 and 177E). General Laws c. 175A, inserted by St. 1947, c. 641, § 1, governs the "regulation of rates for certain casualty insurance, including fidelity, surety and guaranty bonds, and for all other forms of motor vehicle insurance, and regulation of rating organizations." General Laws c. 175E, inserted by St. 1976, c. 266, § 19, governs the "regulation of rates for motor vehicle insurance," and replaced the corresponding provisions of the former c. 175E. By St. 1979, c. 149, the Legislature amended c. 175 by inserting § 162D.

It appears from the legislative history of these statutes that, after the enactment of G. L. c. 175, § 162D, there was a gap in the statutory configuration.[4] Although, under § 162D, insurance companies were required to pay any earned commissions to their agents, they were not required to include any commission rates in their regulatory filings to the division. The Legislature filled this gap in 1982, when it enacted § 162E, which provides that "[a]ny filing of rates . . . made by an insurer doing business in this Commonwealth through independent licensed insurance agents . . . shall specify the amount which such insurer shall pay to such agents as fair and reasonable expense premium commission . . . ." Further, under § 162E, these "commission arrangements shall guarantee that the total amount paid to all such agents . . . shall, in the aggregate, total the [applicable] amounts of commission."

Significantly, § 162E was originally contemplated as an amendment to § 162D.[5] When the decision was made to separate the filing requirement contained in § 162E from the payment provisions contained in § 162D, the Legislature added the following language to protect commission rates during the first four years of the statute's implementation:

> "For private passenger automobile insurance policies and bonds effective during the four-year period commencing on the first day that rates for such insurance are regulated under [c. 175E] following the effective date of this act, *the amount paid in compliance with the requirements of the first paragraph of this section* [requiring insurers to include commission rates in their filings] *shall not be less than the*

---

[4]The MAIA argues that the statutory language is clear and unambiguous and does not support any alternative reading. However, as we have noted, the language of the statute can be interpreted as mandating the immediate payment of commissions owed to agents. We also consider the highlighted language ambiguous because the MAIA's preferred interpretation may conflict with the provision of the statute that allows an insurer to vary the commission paid to each agent by "plus or minus ten per cent." See G. L. c. 175, § 162D.

[5]General Laws c. 175, § 162E, was inserted by St. 1982, c. 371, which enacted 1982 House Doc. No. 6361. This bill, however, was not the first draft of this legislation. Its precursor was 1982 House Doc. No. 3966, which originally proposed the requirement that insurers submit information on agents' commissions in their regulatory filings as an amendment to § 162D. When the latter bill emerged from committee in May, 1982, it had been redrafted as 1982 House Doc. No. 6361, which added § 162E as a new section to c. 175, instead of as an amendment to § 162D.

*dollars produced by utilization of the percentage of expense premium commission established by the commissioner in his opinion, findings and decision on private passenger automobile insurance rates . . . .* An insurer may vary the amount of commission paid to any agent by not more than plus or minus ten percent *provided the proper total dollars are paid.*" (Emphases added.)

Although this paragraph of § 162E was intended to freeze commission rates while new regulations were being implemented, the emphasized language was undoubtedly designed to cover the same ground as the parallel provisions in § 162D, on which the MAIA relies. In § 162E, the Legislature clearly contemplates that the rate of commission paid to an agent will be expressed, ultimately, in a percentage, and that the dollars paid out to the agents shall be determined by applying that percentage to the premium. Under § 162E, the insurer must include information about the commissions paid to its agents in its filings, and under § 162D, it is this amount that must be paid out as commission. Finally, under both §§ 162D and 162E, the amount of the commission must be paid out in dollars, not deferred or credited to an account for future compensation. Read together, these two parts of the statute, intended to govern the same area of motor vehicle insurance rate regulation, contradict the MAIA's assertion that the gross basis for the computation of agents' commissions is mandated by the plain language of the statute.[6]

(b) We are similarly unpersuaded by the MAIA's contention that the commissioner's decision to apply a percentage rate on a net basis is inadequately supported by her findings. The MAIA

---

[6]The fact that the agents' rate of commission is expressed and ultimately applied as a percentage, and not as a flat dollar amount, should come as no surprise to the MAIA. In *Nationwide Mut. Ins. Co.* v. *Commissioner of Ins.*, 397 Mass. 416 (1986), we had occasion to construe § 162D in a case challenging its applicability to an insurer brought under the reach of the statute by a 1980 amendment. Although that case admittedly did not address the MAIA's specific concerns in this case, nonetheless, the agents' rates of commission are referred to as percentages throughout our decision. See *id.* at 419-420, 424. In *Nationwide*, we held that the insurer in question was required to pay the "1981 commission rate of 16.2%" as established by the commissioner "in his annual decision," instead of the rate of 10.69% established in Nationwide's then-existing contract with its agents. *Id.* at 420 n.5 & 423-424. Nowhere in that opinion did we concern ourselves with ensuring that the agents receive the flat or average dollar amount specified in the commissioner's decision.

objects to the commissioner's failure to address its specific concerns regarding the language of the second clause of the last sentence of § 162D (emphasized in our excerpt above) and argues that this failure renders her statement of findings and reasons inadequate for review. We disagree.

The commissioner has wide discretion in determining the methodology to be used in rate setting and related concerns, *Automobile Insurers Bur. of Mass.* v. *Commissioner of Ins.*, 420 Mass. 599, 604-605 (1995), and "the commissioner need not make findings on every controverted issue of fact or law so long as [her] findings indicate the over-all basis for [her] decision and permit effective appellate review." *Aetna Cas. & Sur. Co.* v. *Commissioner of Ins.*, 408 Mass. 363, 374 (1990), citing *Massachusetts Auto. Rating & Acc. Prevention Bur.* v. *Commissioner of Ins.*, 401 Mass. 282, 292 (1987). Nearly eight pages of the commissioner's twenty-six page decision are devoted to the evidence and reasoning in support of her determination that the net basis is an appropriate methodology for calculating agents' commissions on premiums for 1997 automobile insurance policies. We conclude that the testimony and evidence recounted in the commissioner's findings and decision on 1997 rates adequately support her decision to adopt her chosen methodology. See *Aetna Cas. & Sur. Co.*, *supra.* And, as we have concluded that the result of the methodology is not impermissible under the statute, we defer to the commissioner's discretion. See *Attorney Gen.* v. *Department of Pub. Utils.*, 392 Mass. 262, 268-269 (1984), and cases cited.

(c) Similarly, the MAIA's argument that the commissioner is bound to follow the 1996 ruling of the first deputy must fail. The first deputy's advisory ruling was issued on March 13, 1996, in response to inquiries posed by the Professional Independent Insurance Agents of Massachusetts (the predecessor to the MAIA) and an insurer. These parties had sent letters to the division asking whether agent commissions on a policy that contained downward deviation should be calculated before or after the application of the appropriate deviation. The first deputy specifically noted in his response to these inquiries that "[t]he Division is treating your letter as a request for an advisory ruling pursuant to 211 [Code Mass. Regs. §] 17.00 et. seq." In making this advisory ruling, the first deputy presumed that the prospect of downward deviations had not been considered when the parties established the CEPP for 1996, and therefore he

determined that the agents' commissions should be calculated on a gross basis for that year.

Because of general interest in the issue, the Division of Insurance gave interested parties an opportunity to present their opposing views in an informal session on April 11, 1996. At the beginning of that meeting, the first deputy told the parties that any decision in this matter would be limited in applicability to 1996 rates, and he put the parties on notice that they should take the possibility of downward deviation into consideration when calculating the amount of CEPP in 1997.[7] The first deputy reiterated this position in a letter on April 30, 1996, affirming his March 13 advisory ruling, and he indicated that the issue could be raised anew in hearings to fix and establish the 1997 rates, should such a procedure be warranted. It is clear from the 1996 communications between the first deputy and the interested parties that the first deputy intended his advisory ruling to have impact only on the 1996 calculations of agents' commissions.

We see nothing in this series of events that resulted in any precedent necessarily binding on the commissioner's 1997 decision. See and compare *Boston Gas Co.* v. *Department of Pub. Utils.*, 367 Mass. 92, 104 (1975) (party to proceeding before regulatory agency is entitled "to expect and obtain reasoned consistency in the agency's decisions"), with *Massachusetts Gen. Hosp.* v. *Rate Setting Comm'n*, 371 Mass. 705, 706-707 (1977) (where pronouncement by administrative agency is advisory or informal, it does not have binding force of "full-blown regulation"). See also G. L. c. 30A, §§ 1 (5) (*a*) & 8. In 1997, the commissioner was dealing with a fresh set of circumstances, different from those faced by the first deputy in 1996, and concerning an issue that had been preserved for reexamination.

---

[7]At the April 11 meeting, the first deputy issued a comprehensive opening statement, in which he stressed that his advisory ruling:

"will not have an impact on the business decisions insurers must make regarding group marketing discounts or so-called safe driver discounts for 1997 and beyond unless the commission issue goes unaddressed in the 1997 rate hearing. . . . Each party now understands how important it is to consider the possibilities that premiums may be discounted and that such discounts, all of which are good for the consumer may have an impact on commissions and on risk-bearers [and as a result] . . . we must understand the rate hearing process has an impact on the establishment of agents' commissions."

This case is remanded to the county court for entry of a judgment affirming the portion of the commissioner's decision in which she adopts the net basis methodology for calculating agents' commissions.

*So ordered.*